Paulscak *v.* Hoebler (et al., Appellant).

Argued March 24, 1938. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN and BARNES, JJ.

*John M. Reed,* for appellant.

*Thomas M. Benner,* with him *Lawrence B. Cook,* for appellee.

OPINION BY MR. JUSTICE MAXEY, April 18, 1938:

This is an action in trespass. The plaintiff resided on the first floor of a three-story building at 2201 Tustin Street, Pittsburgh, by virtue of a lease from the owner, who is the original defendant in this suit. The Pittsburgh Outdoor Advertising Company, successor to General Outdoor Advertising Company, was brought in as additional defendant on a writ of scire facias, on January 20, 1936.

On or about August 18, 1935, at 6 p. m., the sidewall of this building, constructed of brick, mortar and plaster, and facing on Moultrie Street, caved in and struck the plaintiff, seriously injuring her. The negligence complained of was that the defendant had permitted a

large signboard and electric motor to be placed on top of the building, the motor being used for the purpose of operating a mechanical sign. This, it is alleged, caused a vibration of the building and loosened its foundation and walls, and by reason thereof the wall fronting on the Moultrie Street side of the building gave way and fell upon the plaintiff.

The evidence showed that the building was a brick house constructed about sixty years previously. One of the two signs on top of the building was 17 feet high and 14 feet wide. The other was 13 feet high and 25 feet long. The big sign contained 700 square feet and the little sign 300 square feet. The walls of the building showed signs of disintegration. The mechanism placed on the roof to "agitate the lights" consisted of five 1/30 H. P. electric motors and five perforated metal cylinders. Each cylinder was connected with a motor, and was caused to revolve by means of a chain drive extending from the motor shaft to the bottom of the cylinder. The cylinders revolved about lights in their center, and it was lights shining through the cylinder perforations as they passed a given point which produced the flowing effect on the plate glass sign. The motors ran at a speed of 1,200 revolutions per minute, which by means of a reduction gear caused the motor shaft to make 18 revolutions per minute. The cylinders were about three feet in height and made eight or nine revolutions per minute. The total weight of the equipment was three and one-half tons.

In constructing these signs and motors on the roof, "channels" were first laid across the roof and these rested on concrete pillars and extended to the walls of the building. Down the sides of the building were placed iron strips. These were bolted to the sidewalls by large bolts and were connected with the apparatus on top. The motors were bolted onto planks two inches by six inches, and the planks were supported by four wooden posts resting on the channel irons, and the entire mech-

anism was then enclosed by what is described as a "sheet-iron shanty." The signs themselves rested upon the channel irons.

There were only two issues of fact in the case: (1) whether the operation of the motors and the large sign had been discontinued on June 30, 1935, as the company contended, or had been continued without interruption until the day after the accident; and (2) whether such operation produced noticeable vibration in the building. After the submission of proofs by the respective parties, the jury returned a verdict against the additional defendant in the sum of $4,000. A motion for judgment n. o. v. was refused. This appeal followed.

Appellant raises but two questions: (1) Can negligence in the operation of the five small electric motors already described be inferred from evidence that vibration was felt by occupants of the building, in the absence of complaint or notice? (2) Was there competent evidence that the operation of the motors caused the fall of bricks in a portion of the wall of the building remote from the sign at a time when the sign was not in operation? The court below answered both these questions in the affirmative.

That the operation of the electric motors caused vibration in the building with consequent shaking of the house and rattling of dishes and windows and a bed and falling of plaster was proved. A witness who resided with the plaintiff testified that she told the rent collector about the dishes and windows rattling and he said, "there was a motor on the roof" and he "would go and see about it." A complaint such as this was made four or five times. A third floor tenant of these premises testified that "when the motor was running the windows would be shaking and white dust came from the ceiling, and there was a quivering of the building" and the witness "couldn't sleep." An owner of property across the street from the house in question testified that he "spent most of his time around this property" which he owns,

and that he had been in defendant's house and he had noticed the vibration and rattling of windows when the motors were running and that "every day or two or every morning you could see dust on the street." He said that prior to the putting of the signs on the roof he had never noticed any mortar along the wall of the house. This witness, who was a "contractor," stated that "the electric motors and the heavy weight of the sign" was "the only thing" that he could account for causing the mortar to fall down along the side of the wall. He declared that there was no giving way of the foundation. Another witness who resided a block from the house in question testified that "before the accident" she was with the plaintiff and saw "bad cracks" in the wall, and the paper was cracked on the ceiling and on the walls. She also saw the plaintiff when the bricks from the wall of the house fell on the plaintiff and rendered her unconscious.

A building contractor, who was formerly Superintendent of the Bureau of Building Inspection of Pittsburgh, testified that he on numerous occasions "had contact with collapsed buildings and buildings that became delapidated" and had "razed several hundred buildings during a period of eight years" and he expressed the opinion that the wall collapsed because of "the vibration and use it was not adapted to." Commenting on the fact that the building was 60 years old, this witness said that mortar of the type used sixty years ago had a natural tendency to disintegrate and crumble with age, causing the bricks to become loose. A son of the owner was called as a witness for the appellant and testified that he went to the office of appellant on the day after the signs were erected and informed its representative that the sign was "too heavy and massive for that type of building." The company's representative promised to "have it checked up again." He made two such complaints at the company's office. As a result of these complaints the company, on June 27,

1934, agreed to "cover and indemnify" R. Hoebler, the owner of the building, "against any claim of damages for injuries . . . should anybody be injured by the structure or any portion of same falling off onto the sidewalk."

The defendant company offered evidence that it had stopped the operation of its equipment on this building on June 30, 1935; it also offered evidence to the effect that the motors were not heavy enough and did not run fast enough to cause vibration. It was also testified on the part of defendant that the building and walls had been checked and found adequate before the apparatus was installed. It was argued that if the building vibrated, the cause might have been trucks going down Second Avenue and that boulevard traffic forty feet away might have set up a vibration in the wall.

The opposing evidence and contentions in this case raised a clear cut issue of fact and it cannot be held as a matter of law that the jury was not warranted in drawing the inference that the building in question was not in condition to bear the burden imposed on it by the operation of the equipment installed by the additional defendant. No mortar had fallen and no vibration of the building had been observed until the additional defendant's equipment had been put into operation. The trial judge correctly instructed the jury that it might find as a fact that the cause of the collapsing of the wall was a vibration which had been going on for a period of a year, that it was slight each minute or hour, but that, in the aggregate, over that long period, it had been loosening and weakening the side of the wall and that it therefore eventually collapsed.

The trial judge also correctly charged the jury that a finding of fact as to whether the sign was operated after June 30, 1935, "would not necessarily control the decision." He added: "It is possible that a sign may have been so constructed that it would cause vibration, and it may have been operated up until June 30th and have

done the damage to the wall at that time, and that then, even though it were shut down on June 30th, the wall may have been so weak that it would collapse; but the reason I call this matter to your attention is because it gives you an opportunity to decide where the truth is as between the witnesses on both sides."

The verdict of the jury indicates that the inference was drawn that the operation of the additional defendant's equipment on this building caused vibration over a sufficiently long period of time to cause the wall to collapse, which resulted in plaintiff's injuries. The only legal question is whether or not negligence can be predicated on such a finding. We hold that it can. Elementary caution requires that persons placing heavy machinery to be operated in or upon a building must take due care that it is adequately supported. In view of the fact found in this case, the support must be taken to have been inadequate. The placing of machinery to be set in motion where the supports are inadequate shows want of due care, for adequacy of support is a matter susceptible of predetermination. In the instant case, the additional defendant was chargeable with both actual and constructive notice of the vibration nightly caused by its equipment and of the effect it was producing on the brick work of the side wall. There was proof that the company's employee charged with the duty of lubricating the equipment had been on the roof of the building, observing the operation of the equipment, on at least twenty-five occasions before the collapse. The complaints made at the company's office also put it on notice. The vibration and falling of plaster and rattling of windows, obvious to the tenants over a considerable period of time, ought to have quickened the vigilance of the company, whose equipment caused it, and the attention of whose employees had been called to it. The son of the owner of the building had twice expressed to the officials of the company his concern for the building's safety. The company was not justified in ignoring the

harmful possibilities of this three tons of machinery when in operation. It was chargeable with the foresight the attendant circumstances should naturally have given rise to. These circumstances were equivalent to a warning. The court below correctly held that "when the company, in the face of knowledge, continued to operate the sign and produce the vibration, it became answerable for whatever natural and probable consequences of the vibration might reasonably be anticipated *(Bruggeman v. City of York,* 259 Pa. 94, 98, 102 A. 415), one of which was that the ancient side-wall would be so weakened as to collapse in whole or in part."

In *Gerdes v. Booth & Flinn, Ltd.,* 300 Pa. 586, 591, 150 A. 483, this court said: "When there is danger of an injury to the person or property of one through the act or omission of another, the latter is under a duty to use reasonable care to avoid such injury: 45 C. J. 645; and, further, on page 657: 'it is not necessary, in order to enforce this duty, that injury should be inevitable; that the danger thereof should be great, or even that the chances of injury should exceed the chances of absence of injury; but it is sufficient that the injury is likely or reasonably probable.' "

In *Pa. Steel Co. v. Elmore, etc., Contracting Co.,* 175 Fed. 176, it was held that where defendant, a subcontractor for concrete piers of a bridge, failed to mix the concrete properly and constructed the piers in such a manner that they were unsafe, with knowledge that plaintiff, an independent subcontractor for the iron work, would necessarily place heavy, valuable materials and tools thereon, and one of the piers disintegrated and fell, causing damage to plaintiff's materials and tools, defendant was liable. While in the last cited case, the negligence charged was in the construction of supports, it recognizes the principle that the law will take notice of a situation where an excess load is in superimposition with an inadequate support, and where a person is injured because of that dangerous interrelation, the law

will hold as answerable in damages that party who was primarily responsible for it.

In *Ashby v. Phila. Elec. Co.*, 328 Pa. 474, 478, 195 A. 887, we said: " 'The question whether a person charged with negligence or negligent acts or omissions should have foreseen the injuries resulting from these acts or omissions is for the jury, if there is any credible evidence from which a reasonable conclusion can be drawn in support of the claim of neglect of duty.' "

*McKenna v. The Martin and William H. Nixon Paper Co.*, 176 Pa. 306, 35 A. 131, cited by appellant, is distinguishable from the case at bar. In that case the defendant had leased the building as a paper warehouse for which purpose it had been built and had been used for more than twenty years. This court held that the defendant in that case had no knowledge that the building was not suitable for the purpose for which it was using it. In the opinion in that case, Mr. Justice MITCHELL said: "Nor is there any evidence of negligent overloading. . . . There was not only no evidence that it was loaded by defendants beyond the customary and expected capacity of a paper warehouse, but it was shown that defendant's stock which was paper bags was not so heavy as ordinary paper stock." The decision in that case is authority for the principle that the mere collapse of a building is not of itself proof of negligence. In the case at bar, as we have already pointed out, the defendant had actual and constructive notice that the vibration of its equipment on the roof was causing a disintegration of the building.

In *McGlone v. Angus, Inc., et al.*, 248 N. Y. 197, 161 N. E. 469, Judge CRANE, speaking for the New York Court of Appeals, said: "Negligence is gauged by the ability to anticipate."

On this record it must be held as a matter of law that the additional defendant was properly chargeable with the "ability to anticipate" what happened and its negligence must be gauged accordingly.

The judgment is affirmed.